UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

GREAT GULF CORPORATION,                    Case No. 20-CV-1835 (PJS/TNL)

       Plaintiff/Counter-defendant,

v.                                                    ORDER

WILLIAM TALFORD GRAHAM, R.P.
AIR, INC., and RANDOLPH M.
PENTEL,

       Defendants/Counter-claimants.

---

Erik F. Hansen, Elizabeth M. Cadem, and Kirk A. Tisher, BURNS & HANSEN, P.A.; Barbara P. Berens, BERENS & MILLER, P.A.; Fred A. Schwartz, SHAHADY WURTENBERGER, P.A., for plaintiff/counter-defendant.

Jacob B. Sellers and Justice Ericson Lindell, GREENSTEIN SELLERS PLLC, for defendants/counter-claimants.

In 2013, plaintiff Great Gulf Corporation ("Great Gulf") arranged for a vintage aircraft that it owned—a 1955 Grumman HU-16C (the "Aircraft")—to be flown from Anchorage, Alaska, to Toronto, Ontario, with a planned stop at the Anoka County Airport in Minnesota. After the Aircraft arrived in Minnesota, however, it never left. The Aircraft sat at the Anoka County Airport until May 2019, when defendant Randolph Pentel filed an action in state court in which he sought to establish that he owned the Aircraft. The state court granted default judgment to Pentel. Great Gulf moved to vacate the judgment on the basis that it had never had notice of the action, but

the state court denied its motion.  The state court's judgment was later reversed on

appeal, and the matter was remanded to the state court for further proceedings.  The

state-court action remains pending.

While its state-court appeal was pending, Great Gulf filed this action, naming

Pentel and R.P. Air, Inc.[1] (the "Pentel defendants") and William Talford Graham (Great

Gulf's former president) as defendants.  Great Gulf's complaint asserts fraud and

breach-of-fiduciary-duty claims against Graham and replevin, conversion, and unjust-

enrichment claims against the Pentel defendants.  ECF No. 1.  Great Gulf also asks this

Court to declare that it continues to own the Aircraft.  *Id.*  Defendants have asserted

counterclaims.  ECF No. 38.

This matter is now before the Court on the parties' cross-motions for partial

summary judgment.[2]  For the reasons that follow, Great Gulf's motion is granted in part

and denied in part, and defendants' motion is granted.

---

[1]Pentel is the owner of R.P. Air, Inc., which (along with Pentel) is a plaintiff in the state-court action.  *See* Ex. C to Compl. [ECF No. 1-1].

[2]Before the hearing on the parties' cross-motions, and in response to a sanctions order entered by Magistrate Judge Tony Leung on July 13, 2022, defendants moved to strike one of Great Gulf's supporting affidavits "and any allegations or arguments in [its] memorandum citing thereto or relying thereon or any other documents, statements or materials . . . referred to or relied upon therein."  ECF No. 164.  As explained in more detail below, the Court has not relied on any evidence that was excluded under Judge Leung's order.  Defendants' motion is therefore denied as moot.

I.  BACKGROUND[3]

Great Gulf purchased the Aircraft in September 2012.  Ex. A to Sellers Decl. [ECF

No. 120].  In the spring of 2013, Great Gulf hired Ryan Mohr to fly the Aircraft from

Anchorage, Alaska, to Anoka, Minnesota, where Mohr would perform repairs on the

Aircraft before flying it to Toronto, Ontario.  Ex. B to Sellers Decl. ("Mohr Report").

Mohr flew the Aircraft to Anoka in June 2013 and completed the repairs that were

needed before the Aircraft could be safely flown to Toronto.  *Id.*  Mohr then contacted

Great Gulf's agent, Troy Wilson, to notify him that the repairs were complete.  Wilson,

however, is not a reliable individual; as Mohr and others were to learn, Wilson often

failed to respond to communications and sometimes failed to pay Great Gulf's bills.  In

--------

[3]On July 13, 2022, Judge Leung granted defendants' motion to impose sanctions on Great Gulf for Great Gulf's failure to produce witnesses for depositions as noticed by defendants.  *See* ECF No. 161.  This Court affirmed Judge Leung's order on October 5, 2022.  ECF No. 172.  In addition to ordering Great Gulf to pay monetary sanctions, Judge Leung prohibited Great Gulf (and its representative, Troy Wilson) "from offering any evidence by way of testimony or affidavit for any purpose in this case."  ECF No. 161 at 25.  Therefore, the Court will not consider any of Wilson's affidavits or declarations as evidence in this matter.  Nevertheless, the Court does rely on certain emails which were attached as exhibits to Wilson's affidavits and declarations.

Defendants do not appear to dispute the authenticity of these emails—in fact, defendants attached many of them to their own attorney's declarations and cite to them in their briefs—but even if defendants did, the documents could be authenticated at trial by someone other than Wilson (specifically, by the individual(s) with whom Wilson was communicating).  *See Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) ("[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form.").

typical fashion, Wilson did not initially respond to Mohr or make arrangements for the Aircraft to finish its trip to Toronto. *Id.* The Aircraft was eventually moved out of the Anoka County Airport hangar (where Mohr had completed the repairs) and onto the tarmac at the airport. *Id.*

The Aircraft then sat on the tarmac—year after year—exposed to the harsh Minnesota weather. *See* Mohr Report. As the Aircraft deteriorated, Wilson would sporadically communicate with Mohr and the facility responsible for storing the Aircraft. Often, Wilson would seem to disappear, only to pop up months later. *See* Mohr Report; Ex. L to Sellers Supp. Aff. [ECF No. 155-4]; Ex. F to Sellers Decl. [ECF No. 123]. Throughout the years, however, Great Gulf continued to pay for storage of the Aircraft. The record reflects that Lynx FBO ("Lynx"), the most recent owner of the airport storage facility housing the Aircraft, last received payment from Great Gulf in May 2018. Ex. F to Sellers Decl. (email from Lynx to Wilson dated Sep. 25, 2018); Pentel Supp. Aff. ¶ 4 [ECF No. 153].

Pentel is a wealthy pilot and aviation enthusiast. Pentel learned about the Aircraft in December 2018. In early 2019, he went to the airport to inspect the Aircraft in person. Pentel took photos and videos of the Aircraft and noted that it was in very poor condition as a result of sitting unprotected for several years.[4] Pentel Decl. [ECF

---

[4]Pentel's evaluation was confirmed by Brian J. Rygwall, a pilot and aviation

(continued...)

No. 119]. Pentel later provided the photos and videos to Bolling DeSouza, the owner of

an aircraft-brokerage firm, and DeSouza opined that the Aircraft "had essentially no

value" at the time the photos and videos were taken. Ex. D to Sellers Decl. ("DeSouza

Report") ¶ 38 [ECF No. 120-1].

At about the time that he inspected the Aircraft, Pentel spoke with Mike Agee,

Lynx's general manager, and Agee informed Pentel that Wilson was Lynx's point-of-

contact with respect to the Aircraft. Agee gave Wilson's email address to Pentel, and

Pentel reached out to Wilson to ask about the Aircraft. *See* Pentel Decl.; Pentel Supp.

Aff. Wilson responded on January 11, 2019, telling Pentel that Wilson did not own the

Aircraft but that he "managed it for a period of time. The ownership remains with the

same company." Ex. D to Pentel Supp. Aff. [ECF No. 153-3]. Wilson also informed

Pentel that he had been "asked recently to look into the status of the plane and bring it

back up to airworthy." *Id.* Pentel then asked for the name and telephone number of the

owner of the Aircraft. In response, Wilson informed Pentel that Great Gulf owned the

Aircraft, but told Pentel that Wilson was the point-of-contact for Great Gulf, and asked

Pentel to explain the nature of his interest in the Aircraft. Pentel refused to do so, but

---

[4](...continued)
mechanic whom Pentel hired to inspect the Aircraft. According to Rygwall, at the time
he inspected the Aircraft in September 2019, it "was not airworthy . . . [and] would
require significant repairs, replacements and expense to bring it to condition were it
would pass [sic] the FAA's annual inspection requirements." Ex. C to Sellers Decl.
¶¶ 21–22.

asked again for Great Gulf's direct contact information.  *Id.*  Wilson did not provide that information.

In May or June 2019,[5] Pentel purported to purchase liens on the Aircraft from Lynx and Mohr.  *See* Ex. A to Pentel Decl.; Pentel Supp. Aff. ¶ 12.  At about the same time, Pentel filed an action in state court, seeking a declaration that the Aircraft was unclaimed property under Minn. Stat. § 345.02 and an order declaring that Pentel "[has] a valid lien in and against the Aircraft and directing sale of the Aircraft."  Ex. C to Compl.

Although Pentel knew that Great Gulf owned the Aircraft—and although he had Wilson's contact information—Pentel never notified Great Gulf or Wilson of the lawsuit.  After Pentel's attorney made inaccurate representations to the state-court judge, Pentel obtained a default judgment in September 2019.  Ex. C to Sellers Decl. Supp. Mot. Dismiss [ECF No. 16-3].  A month later, Great Gulf moved to vacate that judgment on the grounds that it had never received notice of the action.  Ex. D to Sellers Decl. Supp. Mot. Dismiss [ECF No. 16-4].  In responding to Great Gulf's motion to vacate, Pentel submitted an affidavit from Graham, in which Graham claimed that he

──────────────

[5]According to Pentel's declaration, he purchased the Lynx and Mohr liens in May 2019.  *See* Pentel Decl. ¶ 7.  However, the purchase agreement for the Lynx lien attached as an exhibit to Pentel's declaration states that it was entered into on June 5, 2019.  Ex. A to Pentel Decl.  Pentel did not provide any supporting documentation for his purported purchase of the Mohr lien.

was the president of Great Gulf and that the motion to vacate had not been not

authorized by the company.  2019 Graham Aff. [ECF No. 154-1].  Graham had no basis

for making that claim, as Graham had not had any involvement in—or even knowledge

of—Great Gulf's operations since 2012.  *Id*. ¶¶ 3–4, 20.  The state court nevertheless

relied on Graham's affidavit in denying Great Gulf's motion to vacate on March 20,

2020.  Ex. G to Compl.  Great Gulf appealed the state court's judgment.

While that appeal was pending before the Minnesota Court of Appeals (which

eventually reversed the state court[6]), Great Gulf filed this action.  It appears that, by the

time Great Gulf filed its complaint, the Pentel defendants had taken possession of the

Aircraft and had begun making repairs to it.  *See* Compl. ¶¶ 60–61; Def. Ltr. to Ct. [ECF

No. 33].

Great Gulf's complaint includes claims for fraud and breach of fiduciary duty

against Graham for his role in assisting Pentel in the state-court litigation (Counts I

and II); claims for replevin, conversion, and unjust enrichment against the Pentel

defendants (Counts III, IV, and V); and a request for a judgment declaring that Great

Gulf is the owner of the Aircraft (Count VI).  ECF No. 1.  After the Court denied

defendants' motion to dismiss, ECF No. 34, defendants filed an answer and

---

[6]The Court of Appeals reversed the district court's default judgment on
March 15, 2021, and remanded the case for further proceedings.  *R.P. Air, Inc. v. Great
Gulf Corp.*, No. A20-0721, 2021 WL 957322 (Minn. Ct. App. Mar. 15, 2021).  The case
remains pending before the district court.

counterclaims.  Defendants seek a judgment that the Pentel defendants are the owners of the Aircraft (Count I) or alternatively that the Aircraft is unclaimed (Count II); ask the Court to enter an order foreclosing on defendants' liens on the Aircraft (Count III); and ask the Court to award them damages (Counts IV, V, and VI).  ECF No. 38.

The action is now before the Court on the parties' cross-motions for partial summary judgment.  For the reasons that follow, defendants' motion is granted in full and Great Gulf's motion is granted in part.

## II.  ANALYSIS

Great Gulf moves for summary judgment on Counts III (replevin) and IV (conversion) of its complaint and on Counts I (declaratory judgment), II (unclaimed property), and III (lien foreclosure) of defendants' counterclaims.  Meanwhile, defendants ask the Court to enter judgment in their favor on Counts I (fraud), IV (conversion), and V (unjust enrichment) of Great Gulf's complaint.

The dispute over the current ownership of the Aircraft is at the heart of both Count III of Great Gulf's complaint (replevin) and Count I of defendants' counterclaims (declaratory judgment).  Therefore, the Court will begin by addressing that dispute.

### A.  Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable

inferences are to be drawn in his favor."  *Id.* at 255.

B. *Current Ownership of the Aircraft*

Great Gulf and the Pentel defendants both claim that they now own the Aircraft.

The Pentel defendants argue that they own the Aircraft because Great Gulf abandoned

it.  Great Gulf denies that it abandoned the Aircraft.  The parties seem to agree that, if

Great Gulf did *not* abandon the Aircraft, then Great Gulf still owns it.

Under Minnesota law (which the parties agree applies), property is abandoned if

it is voluntarily surrendered or disclaimed "absolutely and without reference to any

particular person or purpose."  *Zephier v. Agate*, 957 N.W.2d 866, 872 (Minn. 2021)

(quoting *Bd. of Trs. of First Congregational Church v. Cream City Mut. Ins. Co.*, 96 N.W.2d

690, 693–94 (Minn. 1959)).  To prove that property has been abandoned, a party must

show "(1) actual relinquishment of [the] property, and (2) an intent to permanently part

with the property."  *Id.*  Proving these elements "generally involves a fact-intensive

analysis."  *Id.*

The Pentel defendants' primary evidence that the Aircraft has been abandoned is Great Gulf's "conduct as to the Aircraft and its condition" and Graham's affidavit stating that Great Gulf abandoned the Aircraft.  Def. Memo. & Reply at 19–21 [ECF No. 150].  This evidence is insufficient to create a genuine issue of material fact as to abandonment.

First, the Pentel defendants make much of Great Gulf's neglect of the Aircraft. Great Gulf did indeed allow the Aircraft to fall into disrepair, but the record shows that Great Gulf continued to pay storage fees for the Aircraft until May 2018.  *See* Ex. F to Sellers Decl. (September 25, 2018, email from Lynx representative to Wilson, stating that storage payments were four months behind); Pentel Supp. Aff. ¶ 4 ("[The General Manager of Lynx] further informed me that the storage fee had not been paid since May of 2018.").  Obviously, an owner of an aircraft who pays someone to store it has not abandoned that aircraft.  Because most (if not all) of the deterioration of the Aircraft occurred while Great Gulf was paying to store it—i.e., at a time when it was absolutely clear that Great Gulf had not abandoned the Aircraft—Great Gulf's neglect of the Aircraft does not establish abandonment.  *Cf. State v. Wadja*, No. A09-1071, 2010 WL 2899082, at *4 (Minn. Ct. App. July 27, 2010) (concluding that condemned building was not abandoned, despite being scheduled for demolition, because realtor had secured property after break-ins).

Second, Wilson's communications in late 2018 and in 2019 flatly contradict any assertion that Great Gulf had abandoned the Aircraft.  In November 2018—*before* Great Gulf knew about Pentel's interest in the Aircraft—Wilson reached out to Lynx about paying Great Gulf's outstanding storage invoice.  Ex. F to Sellers Decl. (November 5, 2018, email from Wilson to Lynx representative Steph Kittell).  When Pentel contacted Wilson about the Aircraft in January 2019, Wilson confirmed that the Aircraft's ownership "remains with the same company [Great Gulf]"; in other words, far from indicating that Great Gulf had abandoned the Aircraft, Wilson told Pentel that Great Gulf still owned the Aircraft.  Ex. D to Pentel Supp. Aff.  And in July 2019, Wilson wrote to Lynx again, asking about Great Gulf's outstanding balance so that Great Gulf could make a payment.  Ex. F to Sellers Decl. (July 16, 2019, email from Wilson to Agee).  All of these communications are evidence that Great Gulf never abandoned the Aircraft.

Third, defendants' only direct evidence that Great Gulf intended to permanently part with the Aircraft is an affidavit from Graham, who alleges that "[a]s far as Great Gulf Corp. is concerned the Aircraft was abandoned."  2019 Graham Aff. ¶ 20.  But in the same affidavit, Graham also concedes that he has had not had any involvement in and does not know anything about Great Gulf's operations since 2012 and that he does not possess any "books or records pertaining to the Aircraft" other than an FAA Registration statement that he signed in 2012.  *Id.* ¶¶ 3–4, 20.  Given those admissions,

Graham could not possibly know whether Great Gulf had abandoned the Aircraft.  He thus cannot testify about that subject, either in an affidavit or at trial.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); *Blocker*, 684 F.3d at 793 ("an affidavit or declaration used to support or oppose a motion must be made on personal knowledge").

Finally, the only other evidence that Great Gulf abandoned the Aircraft is the six-month gap between Great Gulf's last storage payment in May 2018 and Wilson's email to Lynx in November 2018.  However, given the course of dealing between Great Gulf and Lynx (or its predecessors)—which featured long periods of silence from Great Gulf and occasional arrearages that Great Gulf eventually paid—the six-month period of silence was business as usual, not evidence of abandonment.

In sum, the evidence in the record would not allow a reasonable jury to find that Great Gulf abandoned its rights in the Aircraft "absolutely and without reference to any particular person or purpose."  *Zephier*, 957 N.W.2d at 872 (quoting *First Congregational Church*, 96 N.W.2d at 693–94).  The Court takes no pleasure in this holding, given that Great Gulf has allowed the Aircraft to deteriorate, while Pentel has invested time and money in trying to restore it.  Ultimately, however, the law is clear that the Aircraft still belongs to Great Gulf.  Thus, the Court grants Great Gulf's motion for summary

judgment on Count I of defendants' counterclaims. (The Court will further address Great Gulf's claim for replevin below.)

### C. Unclaimed Property

Great Gulf also moves for summary judgment on Count II of defendants' counterclaims. In Count II, the Pentel defendants ask the Court to order the sale of the Aircraft pursuant to a Minnesota unclaimed-property statute, which provides that "[i]f any property is not claimed . . . within one year after its reception, it may be sold upon 60 days' notice." Minn. Stat. § 345.02.

Section 345.02 authorizes the sale of property that is "not claimed." The Court is not aware of any decision of a Minnesota court that interprets the phrase "not claimed," so the Court gives the phrase its plain and ordinary meaning: Property is "not claimed" if no purported owner declares rights over it.[7]

Obviously, Great Gulf "claims" the Aircraft. Indeed, Great Gulf has spent a lot of money to establish its ownership of the Aircraft in both state and federal court.

---

[7] *Cf. Unclaimed*, Oxford English Dictionary, https://www.oed.com/view/Entry/210396?redirectedFrom=unclaimed#eid (last visited Feb. 3, 2023) ("not demanded or requested as something which one owns, or to which one has a right"); *Unclaimed*, Merriam-Webster, https://www.merriam-webster.com/dictionary/unclaimed (last visited Feb. 3, 2023) ("not called for by an owner or consignee").

Because the Aircraft is not currently "not claimed," § 345.02 does not apply,[8] and Great

Gulf's motion for summary judgment on Count II of defendants' counterclaims is

granted.

### D.  Liens

Next, Great Gulf moves for summary judgment on Count III of defendants'

counterclaims.  In Count III, the Pentel defendants allege that they acquired two liens

on the Aircraft in 2019—one from Lynx and the other from Mohr.  Defendants conceded

at the summary-judgment hearing that even if they hold valid liens on the Aircraft, they

have not followed the statutory procedures to foreclose on those liens.  And

notwithstanding language to the contrary in their counterclaims, defendants clarified

that they are not attempting to use this action to foreclose on the liens.  Instead,

defendants say, they ask only that the Court enter an order declaring that their liens are

valid and enforceable so that they may take steps to foreclose on those liens.  Great Gulf

contends that neither the Lynx lien nor the Mohr lien is enforceable.

### 1.  The Lynx Lien

---

[8]Even if the Pentel defendants had tried to force the sale of the Aircraft sometime between May 2018 (when Great Gulf made the last storage payment) and November 2018 (when Great Gulf contacted Lynx about paying its outstanding balance)—and even if a court had deemed the Aircraft to be "not claimed" during those six months—§ 345.02 would still not have authorized the sale, as the statute requires that property be "not claimed" for at least a year.

The Pentel defendants allege that Lynx acquired a warehouse lien on the Aircraft pursuant to Minn. Stat. § 336.7-209 and later sold that lien to the Pentel defendants. Under § 336.7-209, "[a] warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation." Great Gulf does not dispute that Lynx obtained a valid warehouse lien. Instead, Great Gulf argues that Lynx never assigned that lien to defendants.

The purchase agreement between Lynx and the Pentel defendants asserts that "Lynx has a statutory lien on the Aircraft pursuant to, among other things, Minn. Stat. § 345.10 (the 'Storage Lien')," and that the Pentel defendants are purchasing "all of [Lynx's] right, title and interest in the Aircraft and the Storage Lien." Ex. A to Pentel Decl. At one point, the Pentel defendants claimed that Lynx had acquired a storage lien pursuant to Minn. Stat. § 345.10; the Pentel defendants have since conceded, however, that Lynx never obtained such a lien. Citing the purchase agreement's citation to § 345.10 and the Pentel defendants' later concession that Lynx never acquired a storage lien under § 345.10, Great Gulf argues that the Pentel defendants did not purchase a valid lien.

The problem for Great Gulf is that the purchase agreement makes clear that the Pentel defendants purchased not just a (non-existent) storage lien under § 345.10, but

-15-

"*all* of Lynx's right, title and interest in the Aircraft." *Id.* The agreement specifically provides that "[Lynx] hereby transfers and assigns to Buyer the Storage Lien *and any and all other right, title and interest it may have in the Aircraft*." *Id.* That language is broad enough to encompass the warehouse lien that Lynx acquired under § 336.7-209. Therefore, the Pentel defendants own Lynx's warehouse lien on the Aircraft.

Great Gulf also argues that defendants have not followed the foreclosure process set out in Minn. Stat. § 336.7-210. That is true, but, as noted, defendants clarified at oral argument that they are not contending that they have foreclosed on the Lynx lien, nor are they asking the Court to foreclose on the lien. Rather, defendants merely seek an order declaring that their lien is valid and enforceable so that they may use the statutory process to foreclose on the lien.

In sum, the Court holds that Lynx had a valid and enforceable warehouse lien on the Aircraft pursuant to § 336.7-209 and that Lynx properly assigned that lien to the Pentel defendants in 2019. The Pentel defendants may proceed with the foreclosure process set forth in Minn. Stat. § 336.7-210.

### 2. The Mohr Lien

The Pentel defendants also allege that they purchased a mechanic's lien on the Aircraft from Mohr. The defendants claim that Mohr acquired that lien under two statutes:

First, defendants argue that Mohr obtained a lien on the Aircraft pursuant to Minn. Stat. § 514.221. But in order for an enforceable lien to arise under § 514.221, the person claiming the lien must register it "in the appropriate filing office under the Uniform Commercial Code" and must do so "within 90 days after performing the work" giving rise to the lien. Minn. Stat. § 514.221, subd. 2. Mohr never registered a lien, and it is much too late for him to do so now, given that he last worked on the Aircraft in 2015. *See* Mohr Report ¶¶ 21–22. As a result, Mohr never acquired an enforceable lien pursuant to § 514.221.[9]

Second, defendants argue that Mohr obtained a possessory mechanic's lien on the Aircraft pursuant to Minn. Stat. § 514.18. But a lien under § 514.18 exists only as long as the lienholder (Mohr) is in possession of the property subject to the lien (the Aircraft). Minn. Stat. § 514.18, subd. 1. If the lienholder loses possession, he must file notice "at any time within 60 days after the . . . loss of possession" if he wishes to preserve his lien. *Id.* subd. 2. Here, the latest that Mohr could have possessed the Aircraft was 2015 (when he last worked on it).[10] Mohr did not file notice of the lien at

---

[9]At the summary-judgment hearing, defendants argued that the lien was never registered because the Aircraft's FAA registration had expired—a fact over which they had no control. This argument was first made at the hearing, however, and thus the Court will not consider it.

[10]Great Gulf argues that Mohr was not in possession of the Aircraft even then because it was being stored in Lynx's facility and Mohr was only given permission to

(continued...)

any time during or after 2015.  By the time the Pentel defendants purported to purchase

Mohr's lien in 2019, it was far too late to file notice.  Thus, Mohr did not have a valid

possessory mechanic's lien to assign to the Pentel defendants.

For these reasons, Great Gulf's motion for summary judgment on Count III of

defendants' counterclaims is granted in part and denied in part.  The Pentel defendants

did not acquire a valid lien from Mohr, but they did acquire a valid lien from Lynx.

And because the Pentel defendants own a valid lien on the Aircraft, they have the right

to possess the Aircraft until Great Gulf pays the debt secured by the lien.  *See State v.*

*Cohen*, 263 N.W. 922, 924 (Minn. 1935) (lienholder has right of possession as to liened

property that defeats owner's right of possession until lien is satisfied); *Abimola-Alli v.*

*Bester Bros. Transfer & Storage Co.*, No. CX-94-2400, 1995 WL 379134, at *3 (Minn. Ct.

App. June 27, 1995) ("appellant was not 'entitled' to the goods because respondent had

acquired a lien against appellant's property and the lien had not been satisfied").  Great

Gulf's motion for summary judgment on Count III of its complaint (insofar as it seeks

replevin) is therefore denied.

### E. Conversion

---

[10](...continued)

enter the facility to perform repairs on the Aircraft.  The Court takes no position on
whether Mohr possessed the Aircraft in 2015.

The parties both move for summary judgment on Great Gulf's claim for conversion of the Aircraft. "Conversion occurs when a person willfully interferes with the personal property of another without lawful justification, depriving the lawful possessor of use and possession." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 896 N.W.2d 115, 125 (Minn. Ct. App. 2017) (quotation omitted), *aff'd*, 913 N.W.2d 687 (Minn. 2018).

In order to succeed on a conversion claim, a plaintiff must have suffered damages. *See Carity Motors v. Eichten*, 249 N.W. 190, 192 (Minn. 1933); *Microsoft Corp. v. Ion Techs. Corp.*, 484 F. Supp. 2d 955, 963–64 (D. Minn. 2007) (applying Minnesota law) ("A plaintiff cannot pursue a conversion claim for damages where no damages arise from the alleged conversion."). "The measure of damages in conversion cases is generally the value of the property at the time of the conversion plus interest." *Molenaar v. United Cattle Co.*, 553 N.W.2d 424, 431 (Minn. Ct. App. 1996).

Defendants' primary defense to Great Gulf's conversion claim is that Great Gulf did not suffer any damages because the Aircraft was worthless at the time of the alleged conversion. To support their defense, defendants hired an expert who opines that the Aircraft "had essentially no value" in February 2019. *See* DeSouza Report ¶ 38.

In response to this expert testimony, Great Gulf offers the affidavit of its representative, Troy Wilson, who alleges that Great Gulf paid $250,000 for the Aircraft

in 2012 and that "[t]he Aircraft is very rare and valuable."  Wilson Aff. [ECF No. 129]

¶¶ 2–3.  But Wilson's testimony is insufficient to raise a question of material fact as to

the Aircraft's value.

As an initial matter, Wilson is prohibited from offering evidence in this case by

way of affidavit or testimony, so the Court will disregard his opinion about the current

value of the Aircraft.  But even if Wilson's testimony were to be considered, the Court

would give it no weight.  First, the amount that Great Gulf paid for the Aircraft in 2012

is not evidence of its value at the time of the alleged conversion—especially given that

Wilson's company had let the Aircraft deteriorate on a tarmac for several years.

Second, assessing the value of a badly deteriorated vintage aircraft requires "scientific,

technical, or other specialized knowledge."  Fed. R. Evid. 701, 702; *see N. Country*

*Escape, LLC v. United States*, 286 F. Supp. 3d 1025, 1033 (D. Minn. 2018) (property-value

opinion was necessarily a matter of expert testimony because it relied "at least in part

on . . . 'specialized knowledge' and training").  Thus, Wilson cannot give lay testimony

as to the value of the Aircraft under Fed. R. Evid. 701—and, because he has not been

qualified as an expert, Wilson cannot give expert testimony as to the value of the

Aircraft under Fed. R. Evid. 702.[11]

---

[11]Great Gulf's fallback argument—"Defendants would not have instituted a legal
action and continued to pursue a claim to ownership of the Aircraft if it was worthless,"
Pl. S.J. Memo. at 15 [ECF No. 132]—has intuitive appeal, but fails to provide either the
(continued...)

In short, Great Gulf has not offered admissible evidence that it has suffered damages, which is an essential element of a conversion claim.  At the same time, defendants have offered admissible evidence that the Aircraft was worthless at the time of the conversion.  For these reasons, the Court grants defendants' motion for summary judgment on Count IV of Great Gulf's complaint.

### F.  Fraud

Great Gulf asserts a fraud claim against Graham based on misrepresentations that he made to the state court in support of the Pentel defendants' efforts to wrest the Aircraft away from Great Gulf.[12]  But neither Great Gulf nor the Court has been able to identify a single case in which a court allowed a plaintiff to obtain damages for fraud

---

[11](...continued)
Court or a jury with a feasible way to measure the damages (if any) to which Great Gulf might be entitled if it were to prevail on its conversion claim.  *See Storage Tech. Corp. v. Cisco Sys., Inc.*, 395 F.3d 921, 928–29 (8th Cir. 2005) ("Under Minnesota law, damages may not be speculative, remote, or conjectural. . . . When the record contains no proof beyond speculation to support the verdict, the defendant is entitled to judgment as a matter of law or summary judgment." (quotation omitted)).  Moreover, it could very well be that the Aircraft's value to the Pentel defendants is wholly sentimental, in which case defendants' efforts to gain ownership would not be evidence that Great Gulf suffered a monetary loss.

[12]To quote Great Gulf's brief:  "Plaintiff's Count I alleges that Graham made the false statements to the *Anoka County District Court*, not Plaintiff.  Per the Anoka County District Court's own Order, it relied on these statements in denying Plaintiff's motion to vacate.  This lead to Plaintiff incurring additional attorneys' fees.  Nowhere in Count I does Plaintiff allege that *it* relied on Graham's false statement."  Pl. S.J. Memo. at 14 (citations omitted).

where the defendant allegedly misled a *court* but did not mislead the *plaintiff.* To the contrary, courts have repeatedly held that "fraud on the court is not an independent cause of action." *Hirsi v. ARCH Language Network, Inc.*, No. A18-1076, 2019 WL 1591800, at *9 (Minn. Ct. App. Apr. 15, 2019); *Bajwa v. Bailey*, No. A14-0055, 2014 WL 3558447 (Minn. Ct. App. July 21, 2014); *see also Chewning v. Ford Motor Co.*, 35 F. Supp. 2d 487, 491 (D.S.C. 1998)*; Lyons v. Ticer Greene*, No. 5:21-CV-00010, 2022 WL 2532460, at *5 (W.D. Va. July 7, 2022); *Ortega v. Young Again Prod., Inc.*, No. CIV. A. H-12-0001, 2012 WL 3046116, at *4 (S.D. Tex. July 25, 2012). As these courts have explained, the remedy for fraud on a court is to inform the court of the fraud and ask the court to vacate the order or judgment that was entered in reliance on the fraud. Great Gulf is already pursuing that remedy in state court.

For these reasons, the Court grants defendants' motion for summary judgment on Count I of Great Gulf's complaint.

### G. Unjust Enrichment

The final claim at issue in these cross-motions is Great Gulf's claim for unjust enrichment. This claim fails for the same reasons that Great Gulf's conversion claim fails. "To establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained *something of value* for which the defendant in equity and good conscience should pay." *ServiceMaster of St. Cloud v. GAB*

*Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (emphasis added) (quotation

omitted).  As explained above, defendants offer unrebutted evidence that the Aircraft

had no value at the time they took possession of it.  On this record, then, a jury would

have to find that defendants did not receive or obtain "something of value."

Defendants' motion for summary judgment on Count V of Great Gulf's complaint is

therefore granted.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1. Defendants' motion for partial summary judgment [ECF No. 116] is

    GRANTED.

2. Plaintiffs' motion for partial summary judgment [ECF No. 127] is

    GRANTED IN PART and DENIED IN PART as explained herein.

3. Counts I, IV, and V of Great Gulf's complaint [ECF No. 1] and Counts I

    and II of defendants' counterclaims [ECF No. 38] are DISMISSED WITH

    PREJUDICE AND ON THE MERITS.

4. The Court DECLARES that the Pentel defendants hold a valid and

    enforceable warehouse lien on the Aircraft pursuant to Minn. Stat. § 336.7-

    209, which lien was assigned to them by Lynx FBO.

5.      Defendants' motion to strike or for a continuance [ECF No. 164] is

DENIED as moot.


Dated:  February 6, 2023                          s/Patrick J. Schiltz
                                                  Patrick J. Schiltz, Chief Judge
                                                  United States District Court